In the Matter of Proving the Last Will and Testament of JOSEPH F. WOOD, Deceased.

MARGARET M. WOOD, Contestant, Appellant; SAMUEL CAPLAN, as Executor, etc., of JOSEPH F. WOOD, Deceased, Proponent, Respondent.

Third Department, December 29, 1937.

*Fitzsimmons & Keefe* [*Wm. E. Fitzsimmons* of counsel], for the appellant. ·

*Caplan & Caplan* [*Oliver J. Flynn* of counsel], for the respondent.

HEFFERNAN, J. Joseph F. Wood, a resident of Albany, N. Y., was admitted to the Veterans' Hospital in the Bronx on September 1, 1936. He died in that institution on December thirteenth of the same year, at the age of about sixty years. It is not disputed that he was incompetent at the time of his death. He was then the owner of personal property of the value of about $13,000. A sister, the contestant in this proceeding, also a resident of Albany, is his sole distributee. Apparently she is without means and is employed as a charwoman at a local hospital.

Decedent left a will executed on January 9, 1936, while he was a patient at St. Peter's Hospital. He also left two codicils, one executed on June 8, 1936, and the other on August 1, 1936. The will and codicils were prepared by Samuel Caplan, the attorney for the respondent, and executed under his supervision. Under the will James Beglin of Albany was given a legacy of $1,500. Each of three cousins residing in Ireland received $2,300. Rae Lindower of Albany received $2,300 and the residue of the estate after the payment of other legacies. Legacies of $100 each were given to St. Peter's Hospital and St. Joseph's Church. In this will testator made the following unusual provision for his sister: " I give and bequeath to my sister Margaret Mary Wood only the sum of twenty-five dollars ($25.00) for reasons well known to her and me." The will nominated Samuel Caplan, the lawyer, as the executor. By the codicil of June eighth testator revoked the bequests to the Irish cousins and also the bequest to the hospital. He provided for a legacy of $500 to Thomas F. Stack " in appreciation of his loyalty." He also directed that " my friend, Samuel Caplan, attorney at law of Albany," should receive a bequest of $500. He also gave to Rae Lindower, Sophie Lindower and Celia Clarke, each, the sum of $2,500 and referred to them as " my dear friends of long standing." These women are sisters. The only change in the codicil of August first is the following: " I cancel and annul the bequest therein of

$500.00 to Thomas Stack because of his disloyalty to me; and I do hereby give and bequeath said sum of $500.00 to my friend, Samuel Caplan of Albany, N. Y., in addition to the other legacy I gave him." It thus appears that by the will and codicils testator gave to Beglin, Caplan and the Lindower sisters bequests aggregating $12,300. In addition thereto, Rae Lindower is bequeathed the residue after the payment of the remaining trifling legacies.

With the exception of the sister and the cousins in Ireland, whose legacies were revoked, none of the legatees named in the will or codicils was related to testator or associated with him in any capacity, with the exception that Beglin was a coworker in the water department of the city of Albany. Apparently testator had only a slight business acquaintance with Caplan. About six years previously he consulted him about the disposition of a joint bank account. That was the only business connection between testator and Caplan and the record shows that they were not close friends.

When Caplan, as executor, offered the will for probate the sister filed objections thereto on the ground that testator lacked testamentary capacity and that undue influence had been practiced upon him. A trial of the issues was had before the surrogate and a jury and at the close of the testimony contestant asked to have submitted to the jury the question of testamentary capacity and undue influence. The court denied the motion and overruled contestant's objections and directed the jury to return a verdict that the will and codicils were valid and admitted them to probate and issued letters testamentary to Caplan, the executor. From the decree of the surrogate contestant has come to this court.

Testator became ill in July, 1935. He was under the care of Dr. Lynch and was treated at his home until December 30, 1935, when he became a patient at St. Peter's Hospital. He was discharged from that institution in March, 1936. Dr. Lynch testified that testator was suffering from "general arterio sclerosis, arterio sclerotic heart disease, and uremia, which of course implies kidney disease. The same process which affected his heart affected his kidneys, the arteries of his kidneys were also hardened." The doctor said that at the time testator entered the hospital he was suffering from all these ailments and that his condition remained the same while he was in the hospital. The doctor was then asked the following question and made the following answer: " Q. Are you in a position doctor, to express an opinion as to what if anything about this trouble affecting his mind? A. Yes, I am. Q. Will you state that, please? A. I am in a position to state that his arterio sclerosis and his uremia did at times affect his mind."

Dr. Lynch also testified that the diseases from which testator was suffering were all progressive. From this testimony the jury might reasonably draw the inference that testator's mind was affected at the time the will was drawn. On June 7, 1936, Dr. Lynch again treated the patient. That was the day before the first codicil was drawn. The physician testified that testator's condition was then precisely the same as it was the previous December. He said that he advised the testator to return to the hospital and that he would not assume responsibility for his condition unless he did so.

Testator was advised to seek admission to the Veterans' Hospital in the Bronx. Apparently the Lindower sisters made the suggestion. They asked a man named Heyer to accompany testator on the trip. Heyer and testator left Albany by train for New York on September 1, 1936. Shortly after the train left Poughkeepsie testator assaulted Heyer and threw him on the floor. Two other passengers in the train assisted Heyer in placing testator in his seat. Heyer said to testator, "Joe, what are you doing?" The latter responded, "I can't help it, I am in awful pain. After the train left Harmon, decedent again assaulted Heyer and again the latter had to call upon a fellow passenger for assistance. While in the Grand Central Station in New York, testator again assaulted Heyer and threw him on the floor. A police officer was called and testator assaulted him and tore two buttons off the officer's uniform. Upon arrival at the hospital testator declined to answer the questions of the nurse. The nurse thereupon handed him a paper with the rules of the hospital and he said that he did not need them and tore them up. Dr. Flowers, a psychiatrist at the Veterans' Hospital, testified that he examined testator on September eighth. As a result of his examination he said: "I found that Mr. Wood was seriously ill, was irrational, what we call delirious in ordinary terms; a psychosis, with heart disease. That means he was delirious, that is the word most people use." He was then asked this question and made the following answer: "Q. The question is, what condition of mind you found as a result of your examination? A. At that time, September 8th, the patient was completely disoriented for time and place, disturbed, had to be restrained at times lest he fall and injure himself, he struck the attendant on several occasions, he has hallucinations, is hearing things, thinks people are after him and calling him names, is disconcerted and disturbed." Dr. Flowers then testified unequivocally that testator was insane at the time.

Caplan, the lawyer, testified that he saw his client on August 31, 1936, and that he not only was mentally alert, but mentally in as fine condition as at any time he had ever known him. This

testimony given by the most important witness to sustain the will is wholly inconsistent with the medical evidence in the case. On cross-examination Caplan admitted moreover that on one occasion when he visited testator in the hospital in New York he was ordered out of the room by testator. He said that " he [testator] was then in the mental ward. I could say, judging by his actions, speech and behavior he was irrational."

Gertrude Keefe Wilsey, a practicing lawyer in Albany, testified that she called on testator in November, 1936, for the purpose of drawing his will. She refused to draw it and gave as her reason that testator was in " no mental condition."

In view of the testimony of Dr. Lynch as to the condition of testator before the will was drawn, his testimony that the ailments were progressive, and the testimony of Dr. Flowers, together with the other circumstances in the record, a jury might well infer that testator lacked testamentary capacity at the time the will and codicils were drawn. Contestant presented enough proof which required the submission of that issue to the jury.

The circumstances surrounding the execution of the will are quite unusual. On January 8, 1936, Caplan testified that he received a telephone message from Rae Lindower, the chief beneficiary under the will, requesting him to go to St. Peter's Hospital, and draw testator's will. Caplan did so on the following morning. While at the hospital he met and talked with Dr. Lynch, testator's attending physician. Dr. Lynch was not requested to act as a witness to the will. Caplan acted as one of the witnesses and procured Dr. Feltman to act as the other. This doctor was a stranger to testator. His own doctor was then in the hospital and yet, strange as it may appear, Dr. Feltman was requested to act as a subscribing witness. The only conversation Dr. Feltman had with testator was to bid him good morning and yet this witness testified that when the will was made testator had testamentary capacity.

There is nothing in the record to indicate that testator and his' sister were not on friendly terms. She, of course, could not testify on the subject but there is proof that she visited him at the hospital and that her brother was quite pleased at the visits. On one occasion when visited by his sister testator referred to how sick he was. He then said: " Well, if it wasn't for Margaret, I wouldn't worry." Sometime during the month of August, 1936, testator in conversation with a friend of his sister's said: " I worry about Margaret quite a lot. I feel so bad, I worry a good deal about her, for she is all I got." While he was in the Bronx hospital he had a conversation with a man named Duel. During this conversation testator said to Duel: " I feel very sorry the way things turned out.

I want to make provisions for Margaret." Duel further testified that " He [testator] told me this while Margaret was at the foot of the bed, that he wanted to make provisions for her, and he told of the visits of three different people from Albany, who had been down there." The three people were " Two sisters, the Misses Lindower I believe, and someone else working at the waterworks, and he had put them out so to speak."

In view of all this testimony it is difficult to understand why testator cut his sister off with a twenty-five dollar legacy with the statement that he did so " for reasons well known to her and me."

There is another provision in the first codicil which deserves attention. In that codicil testator gave Stack the legacy of $500 with the statement that he did so " in appreciation of his loyalty." Within two months testator made a second codicil and canceled the legacy to Stack because of his disloyalty. The legacy intended for Stack was then given to Caplan. A witness for contestant testified that he talked to testator about the Stack legacy and in connection therewith he was then asked the following question and made the following answer: " Q. What was that conversation? A. He told me at different times that he had left him $500.00 but that he had cancelled it. He said Mr. Caplan called one day and said, are you going to leave that fellow in your will after walking out on you, I wouldn't, I would cross him off."

Undue influence such as will invalidate a will is not easy to define with precision. The extent or degree of the influence is wholly immaterial if sufficient to make the act in question the act of another rather than the expression of the mind and heart of the actor. The will before us is an unnatural one. We recognize the rule that a testator possessed of mental capacity may make an unreasonable or an unjust will and thereby disappoint the reasonable expectations of those who are the natural objects of his bounty. The draftsman of this will, for no good reason, is a substantial beneficiary thereunder. He was active in the preparation of the instrument by which he receives a legacy to which he had no natural claim to the exclusion of a penniless sister who was bound to testator by ties of blood and affection. Courts view such conduct with disfavor and consider it a suspicious circumstance inviting close scrutiny and requiring stricter proof of volition and capacity.

The nature and terms of a will are to be judicially regarded as an essential and important part of the evidence of testamentary capacity. If its provisions are just and reasonable this is a circumstance tending to prove capacity, but its provisions may also furnish intrinsic evidence involving the will in suspicion and tending to show the incapacity of the testator to make disposition of his

estate. An unnatural or unjust disposition of a testator's estate is evidence tending to throw light on his testamentary capacity. The disposing parts of a will may be examined to ascertain whether they appear to be so extravagant and unreasonable that they cannot fairly be attributed to any other than a disordered mind. The unnaturalness of a will is a circumstance which a jury may consider, in connection with other evidence, in passing upon the soundness of mind of the testator. Weakness of intellect sufficient to negative testamentary capacity may be traceable to disease and bodily infirmities. The existence of such undue influence as to avoid a will is a question of fact for a jury to determine.

From all proof in the case we are convinced that the question of the testamentary capacity of the testator and the question as to whether or not he was subject to undue influence should have been submitted to the jury. We think the surrogate erred in holding that only questions of law were involved. The decree appealed from should be reversed on the law and facts, with costs to appellant, and a new trial directed before the court and a jury if a trial of the issues by a jury be demanded.

HILL, P. J., RHODES, McNAMEE and BLISS, JJ., concur.

Decree reversed on the law and facts, with costs to the appellant, and a new trial granted.